IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| J&J SPORTS PRODUCTIONS, INC., as Broadcast Licensee of the May 4, 2013 Floyd Mayweather, Jr. v. Robert Guerrero WBC Welterweight Championship Fight Program, | § § § § § § | |
| Plaintiff, | § § | Civil Action No. 3:16-CV-1194-D |
| VS. | § § | |
| JUAN HINOJOSA a/k/a JUAN M. HINOJOSA, Individually, and d/b/a TAQUERIA ZACAPU a/k/a TAQUERIA ZACAPU MITCH 2 a/k/a TAQUERIA ZACAPU MICH 2/JH AUTO SALES, | § § § § § § | |
| Defendant. | § | |

MEMORANDUM OPINION

This cable piracy lawsuit requires the court to decide whether the defendant was specifically authorized by his cable operator to receive the telecast in question, thereby falling within 47 U.S.C. § 553(a)(1)'s safe harbor provision. Following a bench trial, and for the reasons that follow,[1] the court finds that the defendant proved that the safe harbor

---

[1] The court sets out in this memorandum opinion its findings of facts and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1). Although the court has carefully considered the trial testimony and exhibits, this memorandum opinion has been written to comply with the level of detail required in this circuit for findings of fact and conclusions of law. *See, e.g., Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standards). The court has not set out its findings and conclusions in punctilious detail, slavishly traced the claims issue by issue and witness by witness, or indulged in exegetics, parsing or declaiming every fact and each nuance and hypothesis. It has instead written a memorandum opinion that contains findings and conclusions that provide a clear understanding of the basis for the court's decision.

provision applies. Accordingly, the court dismisses this action with prejudice.

I

Plaintiff J&J Sports Productions, Inc. ("J&J") is a media company that markets and licenses commercial broadcasts of pay-per-view boxing matches.[2] J&J follows a particular business model. It purchases the exclusive rights to sublicense the commercial broadcast of a particular boxing match from the promoter. J&J does so by entering into a licensing agreement that gives it the exclusive authority to sublicense public viewing locations of the fight. Any bar, restaurant, or other establishment intending to show the fight to the public purchases the rights to the live broadcast from J&J at rates determined by the establishment's seating capacity. To order the match, these establishments are typically referred to J&J through their cable or satellite television provider. J&J's sublicense only covers commercial viewings; it does not license residential or private viewings of the fights.

One of the commercial broadcasts that J&J sublicensed was the May 4, 2013 fight between Floyd Mayweather and Robert Guerrero ("the Fight"). Under its sublicensing agreement, J&J held "the exclusive licensing to exhibit" the live broadcast of the Fight "only at commercial closed-circuit television exhibition outlets, such as theaters, cars, clubs, lounges, restaurants and the like[.]" P. Ex. 1. The agreement did not cover residential broadcasts of the Fight. It did, however, provide J&J with "the exclusive right to commence or settle any claim or litigation arising out of the alleged piracy, use or proposed use of the

---

[2]Unless otherwise noted, the facts in this section are undisputed.

closed circuit television telecast." *Id.* at 4.

Defendant Juan Hinojosa ("Hinojosa") owned and did business as Taqueria Zacapu (sometimes referred to as "the restaurant"), a now-closed Mexican restaurant located in Irving, Texas. Hinojosa ordered the broadcast of the Fight at Taqueria Zacapu from the restaurant's cable provider, Time Warner Cable ("TWC"). Taqueria Zacapu, however, was a subscriber to a cable account that TWC classified as "residential." The account for the cable signal received at Taqueria Zacapu was in Hinojosa's name. Consequently, when Hinojosa contacted TWC to order the Fight for showing at Taqueria Zacapu, TWC did not refer him to J&J as it would a commercial cable customer. Instead, TWC provided Hinojosa the channel number for viewing the Fight and it billed him at the standard residential, or private viewing, rate for the Fight.[3]

Hinojosa then showed the Fight's live broadcast on Taqueria Zacapu's two televisions. The parties dispute whether the restaurant was open to the public during the Fight. Hinojosa did not advertise that the restaurant was broadcasting the Fight, and the broadcast itself occurred after the restaurant's normal business hours. A private investigator hired by J&J entered the restaurant and witnessed the conclusion of the Fight on restaurant's broadcast.

J&J filed this suit against Hinojosa, alleging that he violated either 47 U.S.C. § 553(a) or § 605(a) by pirating the live broadcast of the Fight. The parties tried the case in a bench

---

[3]The private viewing rate was $59.99. Had Hinojosa ordered the Fight at the commercial rate through J&J, he would have been charged $2,200.

trial.

II

Because J&J concedes in its post-trial briefing that § 605(a) does not apply to this case, the court only considers J&J's claim under § 553(a).[4]

A

47 U.S.C. § 553(a)(1) provides that "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." Before May 2014, district courts in the Fifth Circuit applied a basic strict liability test to § 553 claims that turned on the permission of the license owner. The plaintiff licensor only had to prove that (1) the defendant showed the program for which the plaintiff had an exclusive exhibition license and (2) the license owner had not authorized the defendant to do so. *See J & J Sports Prods., Inc. v. Flor De Cuba, TX, Inc.*, 2014 WL 6851943, at *3 (S.D. Tex. 2014) (Rosenthal, J.) (collecting cases). But in *J & J Sports Productions, Inc. v. Mandell Family Ventures, L.L.C.*, 751 F.3d 346 (5th Cir. 2014), the Fifth Circuit held that § 553 "includes an essential exclusion, often referred to as a 'safe

---

[4] 47 U.S.C. § 605(a) provides that "[n]o person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person." It covers communications traveling through air via radio signal, while § 553 applies only to cable-borne communications. *J & J Sports Prods., Inc. v. Mandell Family Ventures, L.L.C.*, 751 F.3d 346, 352-53 (5th Cir. 2014). Here, the parties agree that the broadcast of the Fight was transmitted over cable. Therefore, only § 553 applies.

harbor,' that precludes the imposition of liability on the majority of cable recipients—customers of cable providers." *Id.* at 348. "The text [of § 553] unambiguously states that the liability extends only to the receipt of cable service *not authorized by a cable operator*." *Id.*(emphasis added). Thus a customer "need only receive authorization from a cable operator for the cable services it receives" to ensure that he is not liable under § 553(a)(1). *Id.*

B

Hinojosa does not contest that the traditional elements of a § 553(a) violation are present here. He admits showing the Fight at the restaurant and that neither he nor any employee of the restaurant ordered the Fight from J&J. Instead, Hinojosa seeks the shelter of § 553's safe harbor provision.

1

No court has decided which party shoulders the burden of proving that § 553(a)(1)'s safe harbor does or does not apply. Most safe harbor provisions are construed as a form of an affirmative defense for which the defendant has the burden of proof. *See, e.g.*, *Capitol Records, LLC v. Vimeo, LLC,* 826 F.3d 78, 94 (2d Cir. 2016) (holding that service provider's entitlement to safe harbor under Digital Millennium Copyright Act is viewed as affirmative defense, and therefore must be raised by defendant); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) (rejecting argument that, to obtain conviction under Anti-Kickback statute, government must prove nonexistence of statute's safe harbor). The text of § 553(a)(1) also supports this interpretation. The safe harbor follows the offense itself, is

separated from the offense by a comma, and is preceded by "unless." *See* 47 U.S.C. § 553(a)(1). Nevertheless, because the court finds that—regardless which party has the burden of proof—a preponderance of the evidence demonstrates that the safe harbor applies, the court will assume *arguendo* that Hinojosa has the burden of proving that his conduct falls within the safe harbor of § 553(a)(1).

2

Hinojosa maintains that this case falls squarely within the safe harbor of § 553(a)(1). He posits that he ordered the Fight through the restaurant's TWC account, paid TWC for the Fight, and received it through TWC's broadcast. Hinojosa therefore reasons that he was "specifically authorized" by his cable operator to show the Fight in the restaurant. J&J contends that 553(a)(1)'s safe harbor is inapposite because Hinojosa's restaurant ordered the Fight through a residential—rather than a commercial—cable account. And it alleges that the restaurant obtained a residential account through fraud and misrepresentation.

3

*Mandell*'s facts and holding indicate that the safe harbor provision is an objective standard. In *Mandell* the defendant restaurant subscribed to a commercial cable account from TWC. When the restaurant ordered the fight, however, TWC mistakenly gave the restaurant access to the fight instead of directing them to the fight's commercial license holder (J&J, the same licensor as in the instant case). The restaurant therefore ordered the fight at the private viewing rate, not the commercial rate. The district court granted

summary judgment in favor of J&J, *Mandell*, 751 F.3d at 347, holding that J&J only had to prove that the event was shown and that J&J had not authorized the exhibition of the event, *id.* at 348, i.e., it applied a strict liability standard. But the *Mandell* panel reversed, holding that there was a disputed issued of material fact whether the safe harbor provision applied. *Id.* at 350. The panel held, in pertinent part, that "in order for a cable customer to ensure that it is not criminally or civilly liable under § 553(a)(1), it need only receive authorization from a cable operator for the cable services it receives." *Id.* at 348.[5]

Since *Mandell*, district courts have primarily applied the safe harbor in circumstances where an establishment that had a commercial cable TV account was mistakenly given the residential rate for a fight. *See, e.g.*, *J&J Sports Prods., Inc. v. Tienda y Taqueria "La Frontera," LLC*, 2017 WL 3166734, at *7 (M.D. La. July 25, 2017) (dismissing § 553 claim under safe harbor because defendant restaurant "had a commercial account with [cable operator] and paid [cable operator] for the Program via pay-per-view"). Neither the language nor reasoning of *Mandell*, however, limits its holding to such circumstances.

The safe harbor provision has also been applied where a commercial establishment accessed a fight at the private viewing rate because its account was misclassified. In *J&J*

---

[5]While neither *Mandell* nor § 553(a)(1) defines the term "authorized," its application in *Mandell* indicates it is the equivalent of "[t]o formally approve; to sanction." *Authorize*, Black's Law Dictionary 153 (9th ed. 2009) (second definition). *Compare id.*, *with Authorize*, Black's Law Dictionary 153 (9th ed. 2009) (first definition) ("[t]o give legal authority; to empower"). TWC formally approved the restaurant's ordering the Fight at the private viewing rate, although it lacked the legal authority to do so under the respective licensing agreements.

*Sports Productions, Inc. v. Madrid Night Club L.L.C.*, 2017 WL 3841911, at *1 (M.D. La. Sept. 1, 2017), the defendant night club mistakenly subscribed to a "business" account rather than a "hospitality" account. As a result, when the night club contacted its cable provider to order the fight in question, it was not directed to the fight's commercial license holder (J&J, the same licensor as in the instant case). Instead, it was able to purchase the broadcast of the fight at the cheaper private viewing rate. J&J maintained that "the Defendants were not authorized to show the fight to nightclub patrons because they did not purchase the fight under a hospitality account." *Id.* at *6. But the *Madrid Night Club* court rejected this position, concluding that the safe harbor provision applied:

> The Fifth Circuit clearly stated in *Mandell* that § 553 does not require cable customers "to take additional steps" to ensure that the cable providers are authorized to distribute a program. If cable customers are not required to verify the cable provider's authority to deliver programming, a fortiori, *a cable customer cannot be held to a duty to verify that the cable provider properly classifies their category of service.*

*Id.* (quoting *Mandell*, 751 F.3d at 348-49) (emphasis added).

4

Hinojosa has proved by a preponderance of the evidence[6] that his restaurant (Taqueria Zacapu) was a subscriber to a residential account with TWC, that he ordered the Fight on

---

[6]The court bases the following findings in part on Hinojosa's trial testimony, which the court finds to be credible.

- 8 -

this account, and that he was billed for the Fight at the residential rate.[7] Hinojosa also proved that he was unaware that his restaurant was a subscriber via a residential account, and that he told TWC he was ordering the Fight for a restaurant. He also proved that TWC representatives visited his restaurant in relation to the TWC account at least twice: once when the account was set up at the restaurant, and once after the Fight. This cable account was active at the restaurant from 2010 until the restaurant closed in 2017.[8] The court therefore finds from a preponderance of evidence that TWC specifically authorized Hinojosa to receive the cable signal for the Fight. Hinojosa's restaurant was a subscriber to a TWC cable account. TWC installed the cable account in Hinojosa's restaurant, and allowed Hinojosa to order the Fight through the restaurant's TWC cable account. His cable bill reflected the charge. His cable operator, therefore, specifically authorized him to receive the broadcast of the Fight.

5

J&C attempts in several ways to distinguish this case from *Mandell* and the post-*Mandell* district court decisions cited above. J&J first maintains that safe harbor is only applicable to establishments with commercial cable accounts—i.e., cases that essentially

---

[7]There is no evidence that Hinojosa did not pay his cable bill in full for the month during which the Fight was shown at his restaurant.

[8]The evidence also demonstrates that Hinojosa showed the Fight in his restaurant outside of normal business hours. The restaurant sold no food or drinks to customers during the Fight, and charged no admission fee or cover charge. In fact, the only invited guests were Hinojosa's family and friends. The door was left open and unmonitored, however, allowing others to enter the restaurant and observe the broadcast of the Fight.

mirror specifically the facts of *Mandell*. Although the present case has some factual distinctions, the court discerns no persuasive basis to decline to apply *Mandell*'s reasoning or result. There is nothing in the language of § 553(a)(1) or in the reasoning or result of *Mandell* to suggest that the safe harbor only applies when a *commercial* account holder is mistakenly specifically authorized to receive a communications service offered over a cable system. To escape liability, the defendant "need only receive authorization from a cable operator for the cable services it receives." *Mandell*, 751 F.3d at 348. And Hinojosa proved by a preponderance of the evidence that he received authorization from TWC, his cable operator, to receive the Fight broadcast.

J&J also contends that Hinojosa cannot prove that he was specifically authorized to receive the Fight broadcast without pointing to language in his contract or terms of service with TWC. The court disagrees. J&J is correct that courts applying § 553(a)(1)'s safe harbor often cite relevant cable contracts and service agreements. *See, e.g., Madrid Night Club*, 2017 WL 3841911, at *5. While such evidence certainly can be probative and assist the trier of fact when determining whether a cable operator specifically authorized the interception or receipt of a communications service, *Mandell* demonstrates this proof is not required. In determining the safe harbor provision's applicability, the panel noted that the defendant submitted affidavits that demonstrated that "TWC authorized the receipt of the broadcast *despite the language in the Service Agreement*." *Mandell*, 751 F.3d at 350

(emphasis added).⁹ In the instant case, the trial testimony and the cable bills are adequate proof for the court to find from a preponderance of the evidence that Hinojosa ordered the Fight through his restaurant's cable account. In other words, he "receive[d] authorization from a cable operator for the cable services [he] receive[d]." *Id.* at 348.

J&J also complains that Hinojosa should not have been able to receive cable TV service for his restaurant via a residential account. The court is not suggesting by its decision today that a defendant can rely on the safe harbor of § 553(a)(1) where he has obtained specific authorization from a cable operator through fraud or deceit. *Cf. Mandell*, 751 F.3d at 350 (applying safe harbor when defendant "did not steal, intercept, or obtain the broadcast under false pretenses"). But here there is little, if any, proof that TWC's authorization was rooted in any misrepresentation. The court finds that Hinojosa did not know that his restaurant account was classified as residential, and none of the restaurant's cable bills introduced at trial label the restaurant's account as "residential."¹⁰ Moreover, TWC's agents had seen the premises of Hinojosa's restaurant multiple times. Hinojosa also testified credibly that he told the TWC representative that he was ordering the Fight for the

---

⁹The defendant in *Mandell* introduced affidavits from both TWC officials and the restaurant owner as summary judgment evidence. *See Mandell* 751 F.3d at 349-50.

¹⁰The cover page of the documents produced by TWC lists the account as residential. But the cover page was produced for use at trial. There is no evidence that Hinojosa was ever presented with, or saw, this cover page before ordering the Fight.

restaurant.[11] And yet TWC did not recategorize the restaurant's cable account or otherwise alert Hinojosa that the account was incorrectly classified.

Moreover, the safe harbor of § 553(a)(1) does not assign to Hinojosa any duty to ensure that his account is classified correctly. As the *Mandell* panel explained, "[t]he statute does not hinge liability on the cable customer taking additional steps or the cable operator being licensed to distribute a broadcast: The exclusion from liability simply applies to those who receive authorization from a cable operator." *Mandell*, 751 F.3d at 348-49. The court is persuaded by the reasoning in *Madrid Night Club*: whether the cable operator's error is in giving the improper rate as in *Mandell*, or is in misclassifying the cable account, the customer does not have a statutory duty to take additional steps. *See Madrid Night Club*, 2017 WL 3841911, at *6. Nor has the court been presented with any contractual or terms of service language that would point to such a burden.[12]

J&J appears to maintain that the fact that a restaurant was receiving cable service

---

[11] In light of this evidence, and because the restaurant itself was a sole proprietorship, the fact that the restaurant's account was in Hinojosa's name is unpersuasive of any intent to defraud. All of the restaurant's utility accounts were in Hinojosa's name.

[12] For example, courts have refused to apply § 553(a)(1)'s safe harbor provision when the terms of service alert the cable customer that the cable operator does not have the right to distribute certain pay-per-view programming. *See, e.g.*, *J & J Sport Prods., Inc. v. Brewster "2" Café, LLC*, 2014 WL 4956501, at *3-4 (E.D. Ark. Oct. 2, 2014) (refusing to apply safe harbor when Comcast Terms and Conditions stated "Comcast does not have the absolute right to distribute pay-per-view video programming . . . to commercial establishments" and required customer to get written authorization); *Joe Hand Promotions, Inc. v. Phoenix Promotions LLC*, 2012 WL 3025107, at *3 (E.D. Mich. July 24, 2012) (same); *J & J Sports Productions, Inc. v. TCOS Enters., Inc.*, 2012 WL 124482, at *2 (E.D. Pa. Jan. 13, 2012) (same). No such contractual provision has been proved in the present case.

through a residential account is per se evidence of subscriber fraud and dishonesty. The court disagrees. A cable operator could misclassify an account by mistake. *See, e.g., Madrid Night Club*, 2017 WL 3841911, at *6. A miscreant employee of a cable operator could also knowingly miscategorize an account without the subscriber's knowledge, perhaps to bolster overall subscriber numbers by signing up customers at residential rates who otherwise would have declined to subscribe at commercial rates. The court need not speculate concerning what happened in the case of Hinojosa's restaurant. But there is no evidence that TWC classified the Taqueria Zacapu restaurant as a residential account due to Hinojosa's fraud or other misconduct. The misclassified cable account in this case is not sufficient evidence of fraud.

J&J provides no other evidence of fraud or deceit by Hinojosa.[13] Examples of evidence it could have presented abound. For instance, J&J did not point to any contractual language that placed a burden on Hinojosa to ensure that his restaurant's cable account was properly classified. Neither did J&J produce a TWC representative or TWC documents to counter Hinojosa's testimony. Instead, J&J conclusorily asserted that the residential account itself was evidence of fraud. As the court has explained, this fact is not alone sufficient. For these reasons, the court finds that Hinojosa—despite his misclassified cable account—"did not steal, intercept, or obtain the broadcast under false pretenses." *Mandell*, 751 F.3d at 350.

---

[13]The court is not placing on J&J the burden of proving that the safe harbor is inapplicable. As explained above, Hinojosa has proved by a preponderance of the evidence that the safe harbor applies. A plaintiff can undermine a defendant's safe harbor evidence with its own evidence of fraud. J&J did not do so in this case.

J&J contends that—*Mandell*'s holding aside—a ruling of no liability in this case will undermine § 553's policy considerations. It posits that, should the court accept Hinojosa's position, the safe harbor exception will swallow § 553's rule. According to J&J, "there would be nothing to stop business owners from setting up their accounts as residential, ordering it through a residential account, and showing it at a commercial establishment." Trial Tr. 170. According to J&J, "every business customer would do that, just to get the fight and get around the commercial licensing fee," ultimately undermining all attempts to enforce cable piracy laws. *Id.* at 169. The court disagrees that such concerns warrant altering its application of § 553(a)(1)'s text and *Mandell* in this case.

These arguments presume that factors such as the negligence or complicity of cable operators will enable commercial establishments to set up their accounts as residential at will, just so that these commercial establishments can pay a lower price to show pay-per-view programming. While this is conceivable theoretically, cable operators presumably have their own reasons for insisting on the proper classification of customer accounts besides the effect on pay-per-view programming, not the least of which is their own profit motive to charge higher commercial rates for cable accounts.

Moreover, if cable operators do not adequately police how customer accounts are established and classified, licensors like J&J are not left without a remedy. As the *Mandell* panel explained, "J&J is not left without a remedy as the unauthorized cable operator may itself be liable for its actions . . . ; the 'safe harbor' protects only the innocent

recipient[.]" *Mandell*, 751 F.3d at 348 n.3.

In fact, applying cable piracy laws against cable operators like TWC provides licensors like J&J an efficient way to preempt the instant case, *Madrid Night Club, Mandell,* and the other instances where cable operators allow commercial establishments to receive fights through their cable accounts rather than through J&J. The imposition of statutory penalties could incentivize cable operators to contractually require subscribers to verify that programming purchased via a residential account is not being received, or shown, at a commercial establishment. Or it could motivate cable companies to take other steps to police themselves and reduce subscription errors. Or licensors could negotiate with promoters for protection against cable operator errors of the type at issue here. In *Mandell*, for example, "TWC offered to pay J&J $2,000 in liquidated damages pursuant to TWC's pay-per-view broadcast agreement." *Mandell*, 751 F.3d at 347 n.1. In sum, there are readily-available methods to deter business owners from establishing their cable accounts as residential in order to reduce their costs of receiving pay-per-view programming. The court's decision today does not undermine those available methods.

Finally, the hypothetical that J&J describes is fraud. Should an exclusive license holder prove that a commercial establishment has subscribed to a residential cable account "just to get the fight and get around the commercial licensing fee," this would demonstrate the intent necessary to prove fraud and negate the availability of the safe harbor.

In the present case, a preponderance of the evidence shows that Hinojosa wanted to receive the Fight at his restaurant, Taqueria Zacapu; he had cable TV service at the restaurant provided by TWC; TWC classified his account as residential, a misclassification that was not the result of Hinojosa's fraudulent or deceitful conduct; Hinojosa contacted TWC to purchase the Fight, he was given a channel on which to view it, and he was charged (and presumably paid) the fee that applied to a residential account; and Hinojosa received the Fight through his cable TV service with TWC. The court therefore finds from a preponderance of the evidence that TWC specifically authorized Hinojosa to receive the Fight and that § 553(a)(1)'s safe harbor applies. J&J is not entitled to recover under § 553(a)(1).

\* \* \*

For the reasons explained, the court finds in Hinojosa's favor on J&J's § 553(a)(1) and § 605(a) claims and dismisses this action by judgment filed today.

March 9, 2018.

*[signature]*
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE